BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Russell F. Wolpert (State Bar No. 97975)
  rwolpert@bgrfirm.com
Christian K. Wrede (State Bar No. 268307)
  cwrede@bgrfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff:
D. STEPHEN SORENSEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| D. STEPHEN SORENSEN, an individual,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>NEW KOOSHAREM CORPORATION, a Delaware corporation; and ANCHORAGE CAPITAL GROUP, LLC, a New York limited liability company,<br><br>　　　　　Defendants. | Case No. CV-15-1088 RGK (PJWx)<br><br>**FIRST-AMENDED COMPLAINT FOR (1) DECLARATORY RELIEF; (2) INJUNCTIVE RELIEF; (3) LIBEL PER SE; (4) BREACH OF CONTRACT; (5) INJUNCTIVE RELIEF; (6) CONVERSION; (7) WRONGFUL TERMINATION; (8) PROMISSORY FRAUD AND FRAUD IN THE INDUCEMENT; (9) VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, ET SEQ.; AND (10) FRAUD**<br><br>**DEMAND FOR JURY TRIAL** |

520831.3

1         Plaintiff D. Stephen Sorensen ("Plaintiff") hereby complains against

2   Defendants New Koosharem Corporation ("NKC") and Anchorage Capital Group

3   ("Anchorage Capital") (together "Defendants") and alleges as follows:

4   **INTRODUCTION**

5       1.    In the 1980s, Plaintiff formed and founded a temporary staffing agency.

6   Over the years and decades since that time, he grew the company, including its

7   successor and others associated with it, to the point where, according to a press

8   release issued by NKC on January 5, 2015, its most recently reported annual

9   revenues exceeded $2 billion, and it was the third ranked industrial staffing firm in

10  the country.  It also found jobs for almost a third of a million workers each year,

11  placing up to approximately 85,000 workers at any given time, aiding both their

12  career development (many of these individuals became permanent or full-time

13  employees) and the many business enterprises requiring additional interim staffing.

14  NKC and related entities also directly employed more than 1,500 individuals.

15      2.    Just this year, NKC publicly touted Plaintiff for being ranked "on

16  Staffing Industry Analysts' 2014 list of most influential people in staffing" and

17  characterized the company he built and ran as being "strong and well respected."

18      3.    After well in excess of a quarter century of growth, expansion, and

19  success, the business encountered challenges in the Great Recession starting in or

20  around 2009.  Although revenue and gross profitability remained strong –

21  particularly in relation to many industry peers – it hit a rough spot.  This is when the

22  "private equity" firms (formerly known as "corporate raiders") who now control

23  NKC – most particularly Anchorage Capital – decided to pounce.

24      4.    Plaintiff thereafter began pursuing a number of recapitalization

25  strategies, including a possible combination with EmployBridge, another entity in

26  the temporary staffing business.  This arrangement would have been advantageous

27  both to Plaintiff personally and to NKC – not to mention to less well-heeled

28  creditors.  However, the private equity firms now controlling NKC rejected such an

520831.3

arrangement out of hand, with Charles Tauber, Daniel Allen, Kevin Ulrich, and Jon Weber of Anchorage Capital telling Plaintiff that they had no desire to see NKC combine with EmployBridge. Rather, they urged Plaintiff to put NKC through a "pre-packaged" reorganization bankruptcy, assuring him that when it emerged from bankruptcy, it would operate as a stand-alone enterprise with Plaintiff as the head of the organization, serving as its Chief Executive Officer ("CEO"). "You're our guy," both Allen and Ulrich told Plaintiff, who consequently dropped efforts to merge with EmployBridge.

5.   The plan set forth by the private equity firms was put into action. The bankruptcy proceedings were completed in May 2014, just a few months after they started, and in connection with the restructuring, NKC issued and offered shares of common stock to various investors that had rights to purchase them, including Plaintiff.

6.   Plaintiff – who had been promised that there would be no merger with EmployBridge, that he would be CEO and have a seat on the Board following the restructuring, and that his equity stake would grow significantly in the months following the bankruptcy without a further investment of capital – invested in excess of $25 million in assets in May 2014 in exchange for approximately 2,750,000 shares of NKC common stock.

7.   Shortly thereafter, NKC – which was, by then, under the tight control of Anchorage Capital – did a 180-degree reversal and advised Plaintiff that NKC did indeed intend to merge with EmployBridge – this time under terms and conditions that were far less remunerative to Plaintiff.

8.   Within a very abbreviated period, on January 5, 2015, during the first week after the Christmas 2014 New Years' 2015 holidays, NKC issued a press release stating that NKC and EmployBridge would merge, and that an executive from EmployBridge would be CEO of the new entity. The same press release stated that, instead of being CEO (as promised), Plaintiff would serve as Vice Chairman of

NKC's Board (a non-executive position with no specified responsibilities or compensation plan).

9.      About two weeks later, on January 19, 2015, Al Aguirre, NKC's Board Chair, sent out a message that NKC was to have a specially set Board meeting the following day, the subject matter of which was secret and would not be disclosed until after the commencement of the meeting itself.  By this time, NKC's Board was firmly under control of the "private equity" funds, particularly Anchorage Capital, and essentially ceased to function as a separate or independent entity, rubber stamping their dictates.  At the meeting, Aguirre – an attorney – accused Plaintiff of various improprieties, including possible crimes, and demanded to interrogate Plaintiff on the spot, with no notice, during the secret, non-agendized Board meeting called for just one day earlier.

10.      On February 10, 2015, one day after the closing of the EmployBridge transaction, NKC wrote a letter to Plaintiff, stating that it was investigating him for wrongdoing – primarily his receiving approximately $2.7 million – which (apart from being done in the normal course, for proper consideration, and effectuated by appropriate personnel at the company) occurred the better part of a year before NKC's February 10, 2015 letter, and was known to NKC for the better part of a year, and for many months before NKC purported to make Plaintiff the Vice Chairman of its Board of Directors.  The February 10, 2015 letter also stated that Plaintiff was being put on *unpaid* "administrative leave," even though NKC's investigation was not completed but was still "ongoing."  Ironically, this came just one day after NKC issued a press release lauding itself for the "tenured leadership throughout the organization" built up over the years of Plaintiff's stewardship.

11.      Even though NKC's February 10, 2015 letter stated that its "investigation" of Plaintiff was incomplete and ongoing, less than one week later – and on a Sunday – NKC purported to give Plaintiff notice of a Board meeting to be held the following day – on President's Day – where the agenda was his firing by

1    NKC.

2        12.    This letter contained a purported notice, which acknowledged that "the

3 Company's investigation is ongoing" rather than completed, but NKC acted

4 nevertheless, meeting specially with one day's notice and on a federal holiday to fire

5 Plaintiff.

6        13.    Although Plaintiff's Employment Agreement expressly forbids NKC

7 from terminating Plaintiff absent "the right to be heard by the Board with counsel

8 present at a meeting of the Board convened to determine whether cause exists to

9 terminate Executive's employment with the Company," and although Plaintiff

10 expressly notified NKC that he and his counsel could not meaningfully prepare for,

11 attend, and participate in such a meeting noticed on a Sunday and set, on one day's

12 notice, to occur twenty-four hours later on a federal holiday, NKC proceeded

13 anyway. It held the meeting, depriving Plaintiff of his procedural and substantive

14 due process rights to prepare, appear, and be heard. Moreover, NKC asserted, and

15 acted on, grounds for termination that were contractually and otherwise prohibited,

16 but nevertheless voted to terminate Plaintiff.

17        14.    Thereafter, NKC embarked on a multitude of fronts to harm and

18 embarrass Plaintiff and to violate his rights. These included:

19          a.    Unilaterally and unlawfully seizing and opening his personal and

20 other mail, and that of his family.

21          b.    Shorting him on rent payable to one of his separate businesses.

22          c.    Shorting him on common area maintenance reimbursements

23 payable to one of his separate businesses.

24          d.    Issuing a "press release" defaming him by gratuitously accusing

25 him of "orchestrat(ing) the improper diversion of $2.7 million" and concocting an

26 "after-the-fact fabrication" to conceal the transaction. NKC referred to the $2.7

27 million as "misappropriated funds." Continuing its "ready-fire-aim" approach,

28 NKC admitted, in this same February 16, 2015 press release, that it was acting and

520831.3

-4-

1  making these accusations based only on "initial findings" of an "ongoing…

2  investigation."

3          e.      Trying to cause Plaintiff to breach agreements to third parties,

4  such as with the owner/lessor of an aircraft with whom a Plaintiff-related entity

5  entered into a lease agreement, notwithstanding the fact that NKC undertook in

6  writing to pay "[a]ny claims arising under the lease and sublease agreements related

7  to (the) airplanes," as well as the fact that Plaintiff (i) graciously acceded to the

8  request of NKC Board Chairman Al Aguirre for NKC to postpone payment of this

9  debt on Plaintiff's behalf so as to not "strain liquidity" and jeopardize company

10  credit lines at a point in time that was key to NKC, and (ii) further agreed to yet

11  another postponement at the request of Paul Gordon of Anchorage Capital, who

12  expressed the belief that paying off NKC's debt before the closing of the

13  EmployBridge transaction would improve pricing, and who promised to pay off the

14  obligation as soon as the combination with EmployBridge closed – which occurred

15  not later than February 9, 2015.

16          f.      Purporting to strip Plaintiff of his seat on the NKC Board.

17          g.      Refusing to award Plaintiff additional shares – worth several

18  millions of dollars – that were promised in connection with Plaintiff's initial

19  investment of more than $25 million in NKC.

20          h.      Going so far as to make petty and/or mean spirited demands of

21  Plaintiff – and to do so on unreasonably short or no notice, and without engaging in

22  appropriate dialogue – such as, by way of example, to demand that he "return" items

23  to NKC which either do not belong to NKC and/or which have little if any value to

24  NKC and to suddenly, out of the blue, and without warning or notice demand that

25  Plaintiff be ousted of possession from certain properties.

26          15.     Defendants even went so far as to convert Plaintiff's personal property,

27  ranging from taking his mail, as indicated above, to retaining various items of his

28  personal property even after he demonstrated proof of payment for such items, to

1  taking and maintaining possession of his electronic personal mail and even his

2  attorney-client communications.

### THE PARTIES

4    16.    Plaintiff D. Stephen Sorensen is an individual residing in the County of

5  Santa Barbara, State of California.

6    17.    Plaintiff is informed and believes, and thereon avers, that Defendant

7  New Koosharem Corporation is a Delaware corporation with its principal place of

8  business in Atlanta, Georgia.

9    18.    Plaintiff is informed and believes, and thereon avers, that Defendant

10  Anchorage Capital Group, LLC is a limited liability company based in New York,

11  whose members are not citizens of the State of California.

### JURISDICTION AND VENUE

13    19.    This Court has original jurisdiction of this action under 28 U.S.C.

14  §1332(a)(1) in that the matter in controversy exceeds the sum or value of $75,000,

15  exclusive of interest and costs, and is between citizens of different States.

16    20.    This district is the proper venue for this action, as a substantial part of

17  the events and omissions giving rise to the claims herein occurred in this district,

18  and Defendants are subject to personal jurisdiction in this district.

### GENERAL ALLEGATIONS

20    21.    Effective on or about May 16, 2014, the parties entered into an

21  agreement captioned "Covenants in Connection with Sale of Business Entity" (the

22  "Covenants Agreement") under which Plaintiff agreed to sell, and NKC agreed to

23  purchase, the capital stock of certain entities.

24    22.    At the time of the Agreement, and for many years prior thereto, NKC

25  had its principal place of business at 3820 State Street, Santa Barbara, California,

26  93105.

27    23.    On January 5, 2015, a written announcement was made that NKC

28  (including its parent and affiliated entities) entered into a merger agreement with a

520831.3

-6-

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

competing and previously unrelated entity, EmployBridge, pursuant to which the companies:

    A.    Agreed to merge; and

    B.    Would be headquartered in Atlanta, Georgia – the existing headquarters of EmployBridge.  The Press Release stated that "The combined company will be headquartered in Atlanta, Georgia."

24.    February 9, 2015 was established as the date for the completion and implementation of the aforesaid merger.

## FIRST CLAIM FOR RELIEF

### Declaratory Relief

### (Against NKC)

25.    Plaintiff avers and incorporates herein by reference each and every averment set forth fully hereinabove in paragraphs 1 through 24, inclusive.

26.    The Covenants Agreement provides, in pertinent part, as follows:

    4.    <u>Non-interference with Business Relationships.</u>  During the Restricted Period, except on behalf of the Companies, Sorensen will not, directly or indirectly, as a director, officer, employee, manager, consultant, independent contractor, advisor or otherwise (including, without limitation, through any member of the Sorensen Group), do any of the following, nor will he permit any Butler Entity to do any of the following: make any statements or do any acts intended to cause, or reasonably likely to cause, or having the effect of causing, any franchisee, customer, client, vendor, distributor, licensor or licensee of the Companies(to make use of the services or purchase the products of any business in which Sorensen (i) has or expects to acquire any interest (other than the Companies), (ii) is or expects, to become a director, officer, employee, manager, consultant, independent contractor, advisor or otherwise (including, without limitation, through any member of the Sorensen Group), or (iii) has received or expects to receive any remuneration, if such services or products Compete with the Business or

    (b)    engage in the Business or otherwise own any interest in, perform any services for or participate in or be

-7-

connected with the Business of any Competitor or any other Business or organization which engages in Competition with the Companies in any jurisdiction;

provided, however, that the provisions of this Section 4 shall not be deemed to prohibit Sorensen's passive ownership of not more than five percent (5%) of the total shares of all classes of stock outstanding of any publicly-traded company.

5.    Non-Solicitation.  During the Restricted Period, except on behalf of the Companies, Sorensen will not, directly or indirectly, as a director, officer, employee, manager, consultant, independent contractor, advisor or otherwise (including, without limitation, through any member of the Sorensen Group), do any of the following, nor will he permit any Butler Entity to do any of the following: Employ or engage or solicit for employment or engagement, or advise or recommend to any other Person that he, she or it employ or solicit for employment or engagement any individual who is an employee or independent contractor of any of the Companies;

(b)    Retain or attempt to retain, or advise or recommend to any other Person that he, she or it retain, the services of any independent contractor or consultant providing services to the Companies, if doing so would diminish the services, being provided to the Companies; or

(c)    Solicit or do business with any present franchisees, customers, clients, vendors, distributors, licensors or licensees of the Companies or any former franchisees, customers, clients, vendors, distributors, licensors or licensees of the Companies or other Persons that were, within the six (6) month period prior to the prohibited conduct, franchisees, customers, clients, vendors, distributors, licensors or licensees of the Companies from whom the Companies derived revenue, for the purpose of Competing with the Companies' Business (prior to the Exclusion End Date, in each case, other than Limited Permitted Assignments or Exempt Customers, in each case, on behalf of any Butler Entity), or (ii) otherwise interfere with the business relationship between the Companies and any franchisee, customer, client, vendor, distributor, licensor or licensee of the

520831.3

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

Companies or other Person. (or any Person known to Sorensen to be a prospective franchisee, customer, client, vendor, distributor, licensor or licensee of the Companies).

With respect to <u>Section 5(a)</u> though <u>Section 5(c)</u> above, and without limiting any obligations Sorensen may have as a fiduciary of any of the Companies:

    (i)    an "employee or independent contractor of any of the Companies" and an "independent contractor or consultant providing services to any of the. Companies" means any of the following (but excluding those certain individuals listed on <u>Exhibit 1</u>):

    A.    any Person who is (at the time of the prohibited conduct) or was (at any time within twenty-four (24) months prior to the prohibited conduct) (I) a senior executive officer of any of the Companies (including Senior Operating Committee members, regional managers, branch managers, and direct reports of Sorensen or Paul Sorensen), .(II) each sales representative that (1) is in the top 25% of all sales representatives of the Companies as measured by (x) annual compensation received in the prior year, (y) annual compensation expected to be received in the current year, or (z) gross revenue generated for the Companies, or (2) has or is otherwise responsible for one or more clients that are in the top 25% of all clients of the Companies measured by gross revenue received from such clients, and (III) recruiters that are in the top 25% of all recruiters of the Companies as measured by (1) annual compensation received in the prior year, (2) annual compensation expected to be received in the current year, or (3) number of Associates recruited to the Companies;

    B.    any Person who is (at the time of the prohibited conduct) or was (at any time within twelve (12) months prior to the prohibited conduct) a manager or supervisor of any of the Companies

(excluding anyone in clause A above or clause C below); and

    C.    any Person who is (at the time of the prohibited conduct) or was (at any time within six (6) months prior to the prohibited conduct) an employee, independent' contractor or consultant of or for any of the Companies and who is not otherwise identified in clauses A and B above, but specifically excluding each Associate.

    (ii)    a "franchisee, customer, client, vendor, distributor, licensor or licensee of the Companies" includes any Person known to Sorensen to be a prospective franchisee, customer, client, vendor, distributor, licensor or licensee of the Companies; and

    (iii)    Sorensen shall not be prohibited from advertising to the general public any employment opportunities or requests for consultancy services (which advertisements are not targeted at employees or independent contractors of any of the Companies), as long as Sorensen otherwise complies with the terms and conditions of this Section 5, which, for the avoidance of doubt, means that Sorensen may not employ or engage any "employee or independent contractor of any of the Companies" or any "independent contractor or consultant providing services to any of the Companies" who responds to such advertisements.

27.    "Business" is defined in the Agreement as:

"(e)    "Business" means (i) the business of providing temporary staffing and employment services throughout the United States and Canada, directly or indirectly, including the provision of such services to third parties, such as, but not limited to, personnel, payroll, and risk management services and (ii) the franchising, as franchisor or franchisee, of businesses for the provision of temporary staffing and employment services throughout the United States and Canada, directly or indirectly, including businesses that provide such services to third parties such as, but not limited to, personnel, payroll, and risk

-10-

1    management services."

2

3    28.    "Competition" is not defined in the Agreement, but "Competitor" is

4    defined as:

5        "(k)    "Competitor" means any person or entity that
         directly or indirectly competes with the Companies in the
6        Business; provided, however, that prior to the Exclusion
         End Date, Competitor shall not include any Butler Entity
7        or Esperer in respect of their Allowed Business but shall
         include Butler Entities and Esperer in respect of all other
8        activities.  The terms "Competition," "Competitive" and
         "Compete" have meanings correlative to the foregoing.
9

10

11    29.    An actual controversy has arisen and now exists between Plaintiff and

12    NKC concerning their respective rights and duties under the Agreement in that

13    Plaintiff contends and, on information and belief, NKC disputes, that:

14    A.    The Non-Competition clause of the Agreement (Section 4 thereof) is

15    neither reasonable nor necessary to protect NKC's interest because, *inter alia*,

16    it is overly broad, it has no geographic boundaries or limits within the entire

17    nation and, indeed, purports to prevent Plaintiff from being involved in the

18    temporary staffing or employment business not only anywhere and

19    everywhere in America, but also in Canada as well, with only the most

20    insignificant of exceptions for highly compensated temporary employees in a

21    small sliver of job segments, and its restrictions on Plaintiff are not reasonable

22    and necessary in their duration, in the activities they cover, or in the territory

23    to which they apply.

24    B.    The Non-Competition clause of the Agreement (Section 4 thereof)

25    purports to prohibit Plaintiff from engaging in any business whatsoever with

26    the categories of persons defined therein – even if such business does not

27    compete with NKC – and is not reasonable and necessary for this reason as

28    well.

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1    C.    The Non-Solicitation clause of the Agreement (Section 5 thereof) is in

2         fact not a non-solicitation agreement, because it purports to prevent Plaintiff

3         from hiring or otherwise doing business with people whether or not Plaintiff

4         solicits them – even if such third parties communicate with Plaintiff in order

5         to seek employment, and it is not restricted to improper methods of

6         solicitation, and is improper and unenforceable for these reasons, among

7         others.

8         30.    Plaintiff desires a judicial determination of his rights and duties, and a

9    declaration as to which party's position as to the meaning and validity of the

10   Agreement's terms as set forth herein is correct.

11        31.    A judicial declaration is necessary and appropriate at this time and

12   under the circumstances in order that Plaintiff may ascertain his rights and duties

13   under the Agreement.  This is particularly important in this instance because, *inter*

14   *alia*, NKC publicly proclaims that it is the "largest industrial staffing company in

15   North America" and states that the combined company will have "$3 billion in

16   combined annual revenue."  NKC has already violated its obligations under its 2014

17   Employment Agreement with Plaintiff, wrongly forcing him out as NKC's Chief

18   Executive Officer in or about early January 2015 and taking away his day to day

19   stewardship of the company, notwithstanding the three year employment term

20   provided in the Employment Agreement under which he was to serve as CEO.

21        32.    Moreover, NKC recently launched an "investigation" of Plaintiff in a

22   transparently obvious attempt to retrospectively justify its past and prospective

23   extra-contractual behavior and its prior, false representations to Plaintiff that it did

24   not desire to merge with EmployBridge when such a merger – desired by Plaintiff –

25   would have been far more financially advantageous to Plaintiff as well as to others.

26        33.    On February 10, 2015, NKC corresponded with Plaintiff, notifying him

27   that effective immediately, he was on *unpaid* "administrative leave" from the

28   company, during which he could no longer enter or access company property, yet

520831.3                                    -12-

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1 | Plaintiff purportedly had to still comply with all (unidentified) "current obligations
2 | to the Company – contractual, statutory, and common law," which obligations, NKC
3 | asserted, "remain in full effect." Attached hereto as Exhibit 1 is a true and correct
4 | copy of the February 10, 2015 letter.

5 |     34.   NKC's purported assertion that Plaintiff had to comply with all
6 | "current obligations" to the company while being paid nothing was, according to
7 | NKC's February 10, 2015 letter, based on (a) a Board meeting that occurred three
8 | weeks earlier, and (b) an "ongoing investigation" that, by NKC's admission was, as
9 | NKC's characterization of its status implies, not concluded.

10 |     35.   A further actual controversy has arisen and now exists between
11 | Plaintiff and NKC concerning their respective rights and duties under a separate
12 | agreement (the "Release") entered into in or about March 2014, pursuant to which
13 | the parties also agreed to discharges, waivers, and releases:

14 |

15 |         "... FROM ANY AND ALL CLAIMS, CAUSES OF
        ACTION, LITIGATION CLAIMS AND ANY OTHER
16 |         DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES,
        ACTIONS, REMEDIES, AND LIABILITIES
17 |         WHATSOEVER, WHETHER KNOWN OR
        UNKNOWN, FORESEEN OR UNFORESEEN,
18 |         EXISTING AS OF THE EFFECTIVE DATE OR
        THEREAFTER ARISING, IN LAW, AT EQUITY,
19 |         WHETHER FOR TORT, CONTRACT, OR
        OTHERWISE, BASED IN WHOLE OR IN PART UPON
20 |         ANY ACT OR OMISSION, TRANSACTION, OR
        OTHER OCCURRENCE OR CIRCUMSTANCES
21 |         EXISTING OR TAKING PLACE PRIOR TO OR ON
        THE EFFECTIVE DATE...."

22 |

23 |     36.   Plaintiff contends that the Release prohibits NKC from terminating
24 | Plaintiff – whether "for cause" or otherwise – and from taking any other adverse
25 | employment decision against Plaintiff, based on any acts or omissions prior to the
26 | effective date of the Release, or without complying with contractual preconditions,
27 | while NKC communicated to Plaintiff the belief that the Release does not immunize
28 | Plaintiff from any past conduct, and acted in contravention of contractual

1 requirements.  The language and interpretation of the Release is therefore in dispute.

2     37.    A judicial declaration is necessary and appropriate at this time and

3 under the circumstances in order for Plaintiff to ascertain his rights and duties under

4 the Release, which is important for the reasons set forth herein.

5     38.    Finally, an actual controversy has arisen and now exists between

6 Plaintiff and NKC concerning their respective rights and duties in that NKC

7 contends, as asserted in its February 10, 2015 letter, that Plaintiff may not enter

8 "Company property or locations, including Company office space," whereas

9 Plaintiff contends that NKC does not have the right to restrict his access to all

10 company property for a variety of reasons, including, *inter alia*, because the

11 building is owned by a Plaintiff related entity, such that Plaintiff is required to have

12 access to such property, and a Plaintiff-related entity is also one of the tenants of the

13 structure, so NKC lacks authority to engage in a de facto, extra-judicial eviction of

14 Plaintiff from his own office space, and further lacks authority to commit waste by

15 preventing the owner/landlord from maintaining and repairing the structure.

16     39.    NKC has also threatened Plaintiff with litigation, stating that Plaintiff

17 can accept NKC's unilateral dictates "the easy way" or have them imposed on him

18 "the hard way."  With NKC trying to create a revisionist history of its improper

19 actions and threatening Plaintiff , Plaintiff does not wish to risk potentially huge

20 damage claims by unilaterally exercising his right to ply his trade or enter his

21 property without this Court's imprimatur.

22 **SECOND CLAIM FOR RELIEF**

23 **Injunctive Relief – Contractual Non-Compete Provisions**

24 **(Against NKC)**

25     40.    Plaintiff avers and incorporates herein by reference each and every

26 averment as set forth fully hereinabove in paragraphs 1 through 39, inclusive.

27     41.    NKC will, unless enjoined and restrained by this Court, demand and

28 seek to prevent Plaintiff from (a) engaging in the employee and staffing business,

520831.3

-14-

1  which has been a mainstay of Plaintiff's professional life since the 1980s, (b)

2  engaging in any business whatsoever with broad categories of persons, (c) hiring

3  individuals even if he has not solicited their employment, all while at the same time

4  having (i) engineered a relationship under which Plaintiff had to forego considerable

5  economic benefits that could have potentially been realized via an earlier merger

6  with EmployBridge, instead offering Plaintiff a guaranty of employment with NKC,

7  only to then (ii) breach that same employment agreement used as an enticement to

8  convince Plaintiff to forego his earlier merger plans and (iii) use the threats on

9  behalf of a company with $3 billion in revenues to prevent Plaintiff from engaging

10  in a wide range of economic activity throughout North America, and (d) seeking to

11  oust Plaintiff from and/or prevent hos access and entry to his own office space and

12  surrounding executive area, common areas, and areas required to properly maintain

13  and repair the structure.

14      42.    NKC's threatened wrongful conduct, unless and until enjoined and

15  restrained by this Court, will cause great and irreparable injury to Plaintiff,

16  including, *inter alia*, because Plaintiff will have to choose between not foregoing

17  future economic opportunities and not being able to use, maintain, and repair

18  property as to which he has property rights independent of any relation with NKC,

19  on the one hand, and doing so and having a company with billions of dollars in

20  revenue threaten him with the risk of incalculable damages, on the other hand.

21      43.    Plaintiff has no adequate remedy at law for the injuries that he is

22  suffering and will continue to suffer absent injunctive relief because, *inter alia*, (a) it

23  would be extremely risky for him to take on the role of judge and jury and simply

24  assume that Sections 4 and 5 of the Agreement are unenforceable and that Plaintiff

25  is legally permitted to use his office and surrounding executive area, meaning he

26  will have to continue to be without a livelihood absent such relief, and (b) it will be

27  impossible for Plaintiff to determine the precise amount of damage that he will

28  suffer if NKC's conduct is not restrained.

1    44.    As a proximate result of NKC's wrongful conduct, Plaintiff has been

2    damaged in a sum not presently known with precision (including because the

3    amount changes and increases daily as NKC's wrongly behavior continues), but

4    believed to already be in the amount of many millions of dollars, and Plaintiff will

5    be further damaged as long as NKC's conduct continues.

6                              **THIRD CLAIM FOR RELIEF**

7                                   **Libel Per Se**

8                                  **(Against NKC)**

9    45.    Plaintiff avers and incorporates herein by reference each and every

10    averment as set forth fully hereinabove in paragraphs 1 - 44, inclusive.

11    46.    On or about February 16, 2015, NKC issued and published a press

12    release captioned "Corporation Terminates D. Stephen Sorensen.  This publication,

13    a true copy of which is attached hereto as Exhibit 2, stated, among other things, that:

14    A.    NKC "terminated D. Stephen Sorensen's employment for cause."

15    B.    "Stephen Sorensen orchestrated the improper diversion of $2.7

16    million."

17    C.    Plaintiff caused an "after-the-fact fabrication and back-dating of a

18    related document in order to cover up this activity."

19    D.    Plaintiff "misappropriated funds."

20    47.    NKC's publication was false as it pertains to Plaintiff, including

21    because:

22    A.    NKC's termination of Plaintiff was not "for cause" – and would not

23    have been permissible even if it had been –but, rather, was a long-planned and

24    pre-determined sham and ploy to wrest full control of NKC from Plaintiff.

25    B.    There was no diversion of funds by Plaintiff and there was no

26    impropriety by Plaintiff.  Plaintiff was the founder and head of a business he

27    built up for decades with in excess of $2 billion in revenues, and he was

28    compensated for his work, but nothing was "diverted;" Plaintiff's

520831.3

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1   remuneration was paid in exchange for consideration provided, and there was

2   nothing "improper" about it.

3   C.      There was no "fabrication" – "after-the-fact" or otherwise.  Nor was

4   there any "cover up."  Instead, the matter was documented in the normal

5   course in a manner that was typical for the enterprise, it was documented by

6   the appropriate persons and department(s) of the company, and Plaintiff was

7   not even involved in the documentation.

8   D.      Nothing was "misappropriated."

9       48.    NKC's publication is libelous on its face, including because it imputes

10  to Plaintiff the commission of a crime; it obviously was intended to, and equally

11  obviously had the objective and clear tendency, to injure Plaintiff in his occupation;

12  it ascribes to Plaintiff improper and immoral conduct (and indeed even uses the term

13  "improper" to describe the purported conduct); it charges Plaintiff with dishonesty

14  (expressly using the word "fabrication"); and it subjects and exposes Plaintiff to

15  contempt and ridicule.

16      49.    The press release was seen and read throughout the nation and was

17  expressly intended to be so seen and read, as defendant published it on Berkshire

18  Hathaway's *BusinessWire* for this precise purpose.

19      50.    As a proximate result of the above-described publication, Plaintiff has

20  suffered loss of his reputation, shame, lost business opportunities, and other

21  damages, according to proof.

22      51.    The above-described publication was published by the defendants with

23  malice, oppression, and fraud, and was prepared, ratified, and approved by NKC's

24  Officers and Directors, warranting the imposition of punitive and exemplary

25  damages.

26      ///

27      ///

28                        **FOURTH CLAIM FOR RELIEF**

520831.3

-17-

## Breach of Written Contract – Employment Agreement

## (Against NKC)

52.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 through 51, inclusive.

53.    For fair and valuable consideration, NKC and Plaintiff agreed upon and entered into a written contract captioned "Employment Agreement" effective on or about May 16, 2014.

54.    In setting forth Plaintiff's "Employment Duties," the Employment Agreement, which refers to Plaintiff throughout as "Executive," states in Section 2(a):

> Executive shall be the Chief Executive Officer of the Company and shall perform such duties and responsibilities for the Company as are customarily associated with such position or as my be assigned perform such duties and responsibilities for the Company as are customarily associated with such position or as may be assigned to Executive by the Board of Directors of the Company (the "Board") from time to time.

55.    The term of Plaintiff's employment is addressed in Section 1 of the Employment Agreement, which states that Plaintiff's initial term of employment was to last three years from the execution of the Employment Agreement and that, absent termination or notice, would "thereafter be automatically extended for an additional twelve (12) month period on each anniversary of the [Employment Agreement]."

56.    As to compensation, Sections 3 – 6 of the Employment Agreement provide that Plaintiff was to receive a base salary of $650,000 per annum, a retention bonus of $500,000 per annum, an annual bonus in the "target" sum of $650,000 – with the possibility of increasing to $1.3 million – and various other benefits, perquisites, and additional consideration.

57.    Section 9 of the Employment Agreement states that "in the event that

1    [NKC] intends to terminate Executive's employment for Cause, Executive shall
2    have the right to be heard by the Board with counsel present."

3        58.    Section 14 of the Employment Agreement, labeled "Non-
4    Disparagement," states that "after an Executive Termination, the Board and senior
5    management shall not make [] statements about Executive" that are "negative,
6    disparaging, detrimental or derogatory" by any method, including statements that
7    "could reasonably be expected to adversely affect in any manner … the business
8    reputation or relationships of the [Executive]."

9        59.    Plaintiff has materially performed all terms of the Employment
10    Agreement required to be performed on his part except insofar as such performance
11    has been prevented and/or excused by NKC.

12        60.    NKC breached the Employment Agreement by contriving to preclude
13    Plaintiff from exercising his contractual right to "be heard by the Board with
14    counsel present" prior to his purported termination.

15        61.    NKC further breached the Employment Agreement by placing Plaintiff
16    on administrative leave without pay, despite the fact that Plaintiff was contractually
17    entitled to compensation.

18        62.    NKC further breached the Employment Agreement by terminating
19    Plaintiff while more than two years remained on the initial three-year term of
20    employment provided in the Employment Agreement.  This constitutes a *de facto*
21    termination for cause, even though no cause exists, no cause ever existed, and to the
22    extent that any action constituting sufficient cause might ever have existed, such
23    matters were released by NKC pursuant to the parties' release agreement entered
24    into in or about May 2014.  Moreover, NKC's purported February 16, 2015 "for
25    cause" termination of Plaintiff was undertaken by NKC in violation of various of its
26    contractual requirements and commitments, both procedural and substantive.

27        63.    NKC further breached the Employment Agreement by issuing a "press
28    release" on February 16, 2015 publicly accusing Plaintiff of "orchestrat(ing) the

520831.3
-19-
FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  improper diversion of $2.7 million" and concocting an "after-the-fact fabrication"
2  and of the claimed "back-dating of a related document" and related false statements.

3      64.    NKC has further breached various other terms of the Employment
4  Agreement, including, *inter alia*, failing to satisfy certain obligations personally
5  guaranteed by Plaintiff and pay third party vendors.

6      65.    NKC has also breached the implied covenant of good faith and fair
7  dealing including, *inter alia*, by:  Initially advising Plaintiff that it did not want to
8  engage in the merger with EmployBridge that Plaintiff sought, instead convincing
9  him to not merge but to go it alone and agree to a pre-packaged bankruptcy and then
10 sign an employment agreement with NKC; then, after Plaintiff committed to this
11 approach and after the Employment Agreement was in place, going forward with the
12 same merger, but on terms far less lucrative to Plaintiff; then purporting to remove
13 Plaintiff from his CEO position as set forth in the Employment Agreement, and put
14 him into a substitute position that was no substitute at all; using company resources
15 to launch an investigation targeting Plaintiff so as to justify NKC's improper
16 behavior; then banishing Plaintiff from the company and refusing to pay Plaintiff
17 per the Employment Agreement based on an investigation that was still ongoing and
18 had not reached its (pre-ordained) conclusion; and then firing him on one day's
19 notice given on a weekend for a meeting to be held on a national holiday – all
20 without complying with its own contractual protocols for so doing.

21     66.    Similarly, NKC has improperly used Plaintiff's unjustified and
22 opportunistic termination as a pretense to deprive Plaintiff of rights and benefits
23 Plaintiff bargained for and secured in connection with negotiations relating to the
24 Employment Agreement.

25     67.    As a proximate result of NKC's breach of contract as aforesaid,
26 Plaintiff has been damaged in an amount not yet fully ascertained, but in the sum of
27 at least several millions of dollars.

28                        **FIFTH CLAIM FOR RELIEF**

5208313

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

**Injunctive Relief – Section 14 of Employment Agreement**

**(Against NKC)**

68.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 through 67, inclusive.

69.    Section 14 of the Employment Agreement, labeled "Non-Disparagement" states that "after an Executive Termination, the Board and senior management shall not make [] statements about Executive" that are "negative, disparaging, detrimental or derogatory" by any method, including statements that "could reasonably be expected to adversely affect in any manner … the business reputation or relationships of the [Executive]."

70.    NKC breached Section 14 of the Employment Agreement by issuing a "press release" on February 16, 2015 accusing Plaintiff of "orchestrat(ing) the improper diversion of $2.7 million" and concocting an "after-the-fact fabrication" and of the claimed "back-dating of a related document."

71.    As set forth in the Employment Agreement, "monetary damages [are] inadequate to compensate" Plaintiff for NKC's breach of Section 14 of the Employment Agreement, and in addition to monetary damages, Plaintiff is therefore entitled to specific performance and injunctive or other equitable relief against NKC "without posting a bond or proving actual damages" and to obtain attorney fees in connection with this action to enforce Section 14.

## SIXTH CLAIM FOR RELIEF

**Conversion**

**(Against NKC)**

72.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 – 71, inclusive.

73.    At all times herein mentioned, Plaintiff was, and remains, the owner and was, and remains, entitled to the possession, of a various items of personal property, including numerous items of personal property in his office at NKC,

electronic devices containing Plaintiff's personal and attorney-client privileged communications, and even his and his family's personal U.S. Mail letters, which defendant converted without Plaintiff's consent.

74.    As a proximate result of NKC's conversion, Plaintiff has suffered damages according to proof, including, by way of example only, damages to his ongoing business and potential business opportunities, invasion of his privacy, and a reduced ability to prosecute this action and defend against NKC's counter-claims, as well as attorneys' fees necessitated by NKC's actions.

75.    The NKC's acts alleged above were willful, wanton, malicious, and oppressive, and were undertaken with the intent to harm and defraud Plaintiff, and were undertaken, approved, and ratified by NKC's Officers and Directors.

### SEVENTH CLAIM FOR RELIEF
### Wrongful Termination
### (Against NKC)

76.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 - 75, inclusive.

77.    NKC wrongly terminated Plaintiff's employment, and did so in bad faith and for impermissible and extra-contractual reasons.

78.    Knowing all along that it would terminate Plaintiff and replace him with their "own man," NKC engineered a deceptive and duplicitous ploy in which it first convinced Plaintiff to forego efforts to inject capital into NKC in a manner more financially advantageous to Plaintiff by dangling in front of Plaintiff the assurance that he would remain in charge of a re-capitalized enterprise poised for greater expansion and growth.  Having deceived Plaintiff and accomplished their takeover of NKC, the corporate raiders who now control the enterprise then pushed the very merger with EmployBridge that they persuaded Plaintiff to forego pursuit of when it would have benefitted Plaintiff.  Reneging on its commitment, NKC then removed Plaintiff from the role of CEO, while indicating that it intended to make

1 | him Vice Chairman of the Board.  NKC then trumped up an allegation of
2 | misappropriation of funds – which in reality was both (a) entirely appropriate
3 | compensation, and (b) known to NKC long before – in order to cloak NKC's real
4 | intent and longstanding plan with a fig-leaf of claimed legitimacy.  However, being
5 | as impetuous as they are deceitful, the leaders of NKC could not even await the
6 | outcome of their own kangaroo court "investigation."  Instead, while the
7 | investigation was admittedly incomplete, they nevertheless fired Plaintiff.
8 | Moreover, they did so on literally 24 hours' notice, given on a Sunday for a meeting
9 | the following day – a national holiday.   The grounds for the termination included
10 | those that contractually could not form the basis for a termination.

11 |     79.    Similarly, NKC has improperly used Plaintiff's unjustified and
12 | opportunistic termination as a pretense to deprive Plaintiff of rights and benefits
13 | Plaintiff bargained for and secured in connection with negotiations relating to his
14 | employment with NKC.

15 | **EIGHTH CLAIM FOR RELIEF**
16 | **Promissory Fraud / Fraud in the Inducement – Employment Agreement**
17 | **(Against NKC)**

18 |     80.    Plaintiff avers and incorporates herein by reference each and every
19 | averment as set forth fully hereinabove in paragraphs 1 - 79, inclusive.

20 |     81.    NKC made material misrepresentations to Plaintiff, including by
21 | representing that it intended for Plaintiff to serve as CEO of NKC after the
22 | restructuring; that it intended Plaintiff's term as NKC's CEO to last for at least three
23 | years following the completion of the restructuring; that absent unforeseen
24 | circumstances, Plaintiff's initial three-year term as NKC's CEO would be
25 | automatically and indefinitely extended in one-year increments; that NKC would not
26 | seek to terminate Plaintiff's employment with NKC unless there were (post-
27 | recapitalization) cause to do so under the Employment Agreement; that Plaintiff
28 | would receive a substantial additional award of NKC shares when certain financial

520831.3

-23-

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  targets had been reached; and that Plaintiff would have control of a seat on the NKC

2  Board.

3      82.    Similarly, NKC failed to disclose to Plaintiff that, prior to and at the

4  time the Employment Agreement was executed, NKC was considering a post-

5  restructuring merger with EmployBridge and was contemplating the possibility of

6  replacing Plaintiff as CEO with an EmployBridge executive in the event a merger

7  took place. NKC further failed to disclose that it offered the seemingly attractive

8  terms set forth in various contracts – terms NKC never intended to honor – solely

9  for fraudulent purposes, including securing Plaintiff's support for the restructuring;

10  inducing Plaintiff to make a sizeable investment in shares of NKC's common stock;

11  setting the stage for post-restructuring merger with EmployBridge; securing

12  competent executive leadership, in the person of Plaintiff, during the gap year

13  between the completion of NKC's restructuring and the completion of the

14  EmployBridge merger; and to prevent Plaintiff, one of the temporary staffing

15  industry's most seasoned executives, from competing with NKC or whatever entity

16  was created through the contemplated combination of NKC and EmployBridge.

17      83.    NKC's misrepresentations and omissions were material, false and

18  misleading, and NKC knew they were material, false and misleading at the time

19  they were made or, at a minimum, acted with reckless disregard as to whether

20  material information had been misrepresented or omitted in connection with the

21  negotiation and execution the Employment Agreement. NKC purported to take

22  Plaintiff out of his executive role and confine him to a position on the Board just

23  months into the three-year employment term set forth in the Employment

24  Agreement, and purported to terminate Plaintiff within days of the completion of the

25  EmployBridge merger. Moreover, the EmployBridge merger was undertaken

26  almost immediately and completed less than a year after the Employment

27  Agreement was signed.

28      84.    NKC made the misrepresentations and omissions alleged here with the

intent of inducing Plaintiff to make a sizeable investment in NKC common stock; laying the groundwork for the EmployBridge merger; tricking Plaintiff into unwittingly providing his services as CEO on a temporary basis, so NKC would have capable leadership for the 11-month period from May 2014, when the restructuring was completed, to February 2015, when the EmployBridge merger closed and Plaintiff was putatively replaced; and to prevent Plaintiff from competing with NKC or any of its successors following his foreordained termination.

85.     Plaintiff actually, reasonably, and justifiably relied to his detriment on NKC's misrepresentations and omissions in, *inter alia*, investing more than $25 million in assets in shares of NKC common stock, and entering into the Employment Agreement.  Given his long and successful history in the temporary staffing industry, Plaintiff had no reason to suspect that, despite repeated assurances to the contrary, NKC was scheming to replace him, and no means beyond the discussions and exchange of documents in which he actually engaged with NKC of verifying NKC's intent as to Plaintiff's future employment.

86.     As a direct and proximate result of NKC's material misrepresentations and omissions, Plaintiff has suffered damages in an amount to be proven at trial but exceeding the sum of several million dollars. These damages arise from, *inter alia*, remuneration that could have been secured through an alternate restructuring plan, lost compensation, and lost opportunities arising from constraints on Plaintiff's ability to compete in the industry in which he has built his career and expertise. Plaintiff is further entitled, at his discretion, to the void any transaction or agreement, including the Employment Agreement, secured through NKC's fraud.

87.     The wrongful acts and omissions of NKC described herein were done with malice, oppression, and fraud, warranting the imposition of punitive and exemplary damages.

## NINTH CLAIM FOR RELIEF

### Unfair Competition, Cal. Bus. & Prof. Code §17200

**(Against All Defendants)**

88.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 - 87, inclusive.

89.    Defendants' conduct as alleged herein constitutes unfair, unlawful, and fraudulent business practices prohibited by §17200 *et seq.* of the California Business & Professions Code as set forth hereinabove, including, by way of example only, fraudulently inducing Plaintiff to forgo an alternative and more remunerative form of restructuring; fraudulently inducing Plaintiff to enter into the Employment Agreement; seeking to discredit Plaintiff within his industry; seeking to prevent Plaintiff from competing with NKC; and otherwise action as aforesaid.

90.    Plaintiff is informed and believes, and thereon alleges, that as a direct and proximate result of Defendants' wrongful conduct as described above, Defendants have gained property, revenues, and opportunities properly belonging to Plaintiff.  Plaintiff therefore seeks corresponding restitution.  Plaintiff also seeks injunctive relief restraining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from further engaging in acts of unfair competition and/or fraudulent business acts against Plaintiff.

## TENTH CLAIM FOR RELIEF

### Fraud

**(Against All Defendants)**

91.    Plaintiff avers and incorporates herein by reference each and every averment as set forth fully hereinabove in paragraphs 1 - 90 inclusive.

92.    NKC issued, offered and, in May 2014, sold to Plaintiff approximately 2.75 million shares of common stock in exchange for Plaintiff's investment of more than $25 million in assets.

93.    In or about the last calendar quarter of 2013, prior to Plaintiff's acquisition of these shares of NKC's common stock, Anchorage Capital flew Plaintiff from California to a ranch in Montana for a conference of senior executives

from entities in which Anchorage Capital had made – or intended to make –
investments (the "Conference").

94.    During the Conference, Kevin Ulrich, who was a senior executive with
Anchorage Capital at the time, personally assured Plaintiff during a walk around the
ranch, that, if Anchorage Capital's restructuring plan were implemented, there
would be no merger with EmployBridge and Plaintiff would remain CEO of NKC.

95.    During the Conference, Daniel Allen, who, like Kevin Ulrich, was a
senior executive with Anchorage Capital at the time, also represented to Plaintiff
that, if Anchorage Capital's restructuring plan were implemented, there would be no
merger with EmployBridge, and Plaintiff would remain CEO of NKC.

96.    In connection with Plaintiff's subsequent acquisition of shares in NKC,
NKC and Plaintiff entered into the following three written contracts:

A.    A May 16, 2014 Employment Agreement between NKC and Plaintiff
stating, *inter alia*, that Plaintiff would serve as CEO of NKC for an initial
term of three years, with an indefinite number of automatic 12-month
extensions;

B.    A May 16, 2014 contract entitled "Stockholders Agreement" giving
Plaintiff the right to serve on or appoint a designee to serve on NKC's Board
of Directors; and

C.    A May 16, 2014 contract entitled "Restricted Stock Award Agreement"
stating that Plaintiff would automatically receive nearly 1.4 million additional
shares of NKC common stock as soon as NKC met certain financial targets.

97.    As of February 2015, NKC, which, by then, was tightly controlled by
Anchorage Capital, completed a merger with EmployBridge.  In connection with the
merger, NKC's Board announced that Plaintiff would be relegated to the non-
executive role of Vice Chairman of NKC's Board, and would be replaced as CEO
by an executive from EmployBridge.

98.    Later that month of February, 2015, NKC purported to terminate

1  Plaintiff's employment with NKC.  Based on this purported termination, NKC also

2  stripped Plaintiff of his right to sit on or appoint a designee to the NKC Board, and

3  has further refused to award Plaintiff the additional shares promised in connection

4  with Plaintiff's initial investment in NKC's common stock.

5       99.    At the times Defendants made the representations set forth above, each

6  knew the representations to be material, false and misleading, or at least acted with

7  reckless disregard for the truth of such statements.  Defendants misled Plaintiff to

8  win his crucial support for NKC's preferred restructuring plan, to secure his

9  investment of more than $25 million in NKC shares, and to secure his temporary

10  services as CEO during the 11-month period in which the merger was executed.

11  Indeed, NKC completed the EmployBridge merger and replaced Plaintiff with an

12  EmployBridge executive within a year of when Defendants' misrepresentations

13  were made.

14       100.   At the times Defendants made these false representations and wrongful

15  omissions, Plaintiff was unaware of the omissions or that the representations were

16  false, and supported Anchorage Capital's restructuring plan and purchased a multi-

17  million stake in NKC's common stock in reliance on Defendants'

18  misrepresentations, including that NKC would not merge with EmployBridge, that

19  Plaintiff would play key roles with respect to both management and governance at

20  NKC for an extended period following the restructuring, and that the number of

21  shares Plaintiff held in NKC would expand significantly – by about 50%, in fact –

22  without any additional investment of capital by Plaintiff.  As one of the leading

23  executives in his industry, Plaintiff would never have acted as he did and would not

24  have made such a significant investment in a temporary staffing enterprise that he

25  was to have no role in running or otherwise overseeing.  Moreover, Plaintiff had no

26  means, other than the very exchanges with Defendants in which he engaged, to

27  assess the veracity of their representations regarding their undisclosed future

28  actions.

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

101.   As a direct and proximate result of Defendants' false and misleading representations and concealment of the facts alleged herein, Plaintiff has been damaged in amounts to be determined in accordance with proof at trial.  Such damages include, but are not limited to, the value of the employment and additional shares of common stock Plaintiff was promised in connection with his investment of more than $25 million, as well as the amount by which Plaintiff overpaid for his stake in NKC based on Defendants' misrepresentations and omissions, according to proof.

102.   The wrongful acts and omissions of Defendants described herein were done with malice, oppression, and fraud, warranting the imposition of punitive and exemplary damages.

### **PRAYER**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.   For monetary damages according to proof;

2.   For a declaration, and for the issuance of injunctive relief, that:

(a)  Sections 4 and 5 of the May 16, 2014 Agreement are unenforceable;

(b)  the Release prohibits NKC from terminating Plaintiff for cause, and from taking any other adverse employment decision against Plaintiff, based on any acts or omissions prior to the effective date of the Release, and without complying with the contractual preconditions;

(c)  NKC's placement of Plaintiff on "administrative leave" was, in effect, an impermissible termination for cause, and its later termination for cause was impermissible; and

(d)  NKC is not entitled to restrict Plaintiff's use of his office and surrounding executive area or from maintaining and repairing the property.

3.   For punitive and exemplary damages;

4.   For an award of attorneys' fees;

5.      For costs of suit incurred herein; and

6.      For such other and further relief as the Court deems just and proper.

DATED:  May 12, 2015                    BROWNE GEORGE ROSS LLP
                                        Eric M. George
                                        Russell F. Wolpert
                                        Christian Wrede


                                        By      /s/ Eric M. George
                                                Eric M. George
                                        Attorneys for Plaintiff D. Stephen Sorensen

520831.3

-30-

FIRST-AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1

## DEMAND FOR JURY TRIAL

2     Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal

3 Rules of Civil Procedure.

4

5

6 DATED:  May 12, 2015           BROWNE GEORGE ROSS LLP

7                       Eric M. George
                      Russell F. Wolpert

8                       Christian Wrede

9

10           By     /s/ Eric M. George
                      Eric M. George

11         Attorneys for Plaintiff D. Stephen Sorensen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

520831.3

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

4       At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My

5   business address is 2121 Avenue of the Stars, Suite 2400, Los Angeles, CA 90067.

6       On May 12, 2015, I served true copies of the following document(s) described as

7

8   **FIRST-AMENDED COMPLAINT FOR (1) DECLARATORY RELIEF; (2) INJUNCTIVE RELIEF; (3) LIBEL PER SE; (4) BREACH OF CONTRACT;**

9   **(5) INJUNCTIVE RELIEF; (6) CONVERSION;  (7) WRONGFUL**

10  **TERMINATION; (8) PROMISSORY FRAUD AND FRAUD IN THE INDUCEMENT; (9) VIOLATIONS OF CALIFORNIA BUSINESS AND**

11  **PROFESSIONS CODE SECTION 17200, ET SEQ.; AND (10) FRAUD**

12  on the interested parties in this action as follows:

13                    **SEE ATTACHED SERVICE LIST**

14

15      **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.

16  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will

17  be served by mail or by other means permitted by the court rules.

18      I declare under penalty of perjury under the laws of the State of California

19  that the foregoing is true and correct.

20      Executed on May 12, 2015, at Los Angeles, California.

21

22                              /s/ Venus Bernardo

23                              Venus Bernardo

24

25

26

27

28

1
2

*D. Stephen Sorensen v. New Koosharem Corporation, et al. and related counter action*

3

**United States District Court, Central District of California**
**Case No. 2:15-CV-01088-RGK(PJWx)**

4

5    John C. Hueston                          Attorneys for Defendant and
6    Allison L. Libeu                         Counter-Plaintiff
     Jennifer R. Bunn
7    Zachary T. Elsea
8    HUESTON HENNIGAN LLP
     620 Newport Center Dr., Ste 1300
9    Newport Beach, CA  92660
10   Tel.: (949)229-8640
     Fax:  (888)775-0898
11   jhueston@hueston.com
12   alibeu@hueston.com
     jbunn@hueston.com
13   zelsea@hueston.com

14
     Alan J. Stone                            Attorneys for Defendant and
15   Samir L. Vora                            Counter-Plaintiff
16   MILBANK, TWEED, HADLEY & MCCLOY
     LLP
17   601 S. Figueroa St., 30th Floor
18   Los Angeles, CA  90017
     Tel.: (213)892-4595
19   Fax:  (213)892-4795
20   astone@milbank.com
     svora@milbank.com

21
22
23
24
25
26
27
28